IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-308

Filed 20 February 2024

Wake County, No. 17 CVD 164

JENNIFER C. DURBIN, Plaintiff,

v.

MATTHEW L. DURBIN, Defendant.

Appeal by Defendant from order entered 8 July 2022 by Judge Julie Bell in Wake County District Court. Heard in the Court of Appeals 1 November 2023.

*Jackson Family Law, by Jill Schnabel Jackson, for plaintiff-appellee.*

*Fox Rothschild LLP, by Kip D. Nelson and Jonathan L. Taggart, for defendant-appellant.*

MURPHY, Judge.

When ruling on a motion for the modification of child custody, the existence of an ongoing conflict or propensity for conflict between the parties that has persisted since the original custody order does not preclude a conclusion on behalf of the trial court that the ongoing conflict constitutes, or contributes to, a substantial change in circumstances affecting the welfare of the children. However, it is also not presumed from the mere existence of an ongoing conflict that the conflict adversely affects the children, especially where, as here, the trial court's findings of fact actually suggest the children were relatively insulated from the conflict. As the trial court's findings of fact in this case did not support its conclusion of law that a substantial change in

circumstances affecting the welfare of the children had occurred, we reverse the trial court's modification order.

## BACKGROUND

This case arises from an 8 July 2022 order of the trial court modifying child custody shared between Plaintiff, Jennifer Durbin, and Defendant, Matthew Durbin, in response to Plaintiff's 8 October 2021 motion. The order, which substantially rendered permanent the terms of two temporary child custody orders entered 12 January 2022 and 9 February 2022, replaced the previously effective *Consent Order for Child Custody and Child Support* entered 30 October 2020. The original order provided, in relevant part, that Plaintiff and Defendant shared joint legal custody, shared physical custody in roughly equal measures, shared a responsibility for communicating information pertaining to the children's health, and expressly contemplated the children having routine medication. The original order further established an obligation to act in good faith to "enhance and nourish the relationship between each other and the children" and to avoid scheduling activities for the children during the other party's custodial time.

In addition to the original order, the parties entered into an *Order Appointing Parenting Coordinator by Consent* on 10 December 2020 appointing Tiffany Lesnik as the replacement for their original parenting coordinator, Dr. Kari Lenox. In the wake of her appointment, Defendant and Lesnik developed a contentious relationship, with Defendant moving on 30 April 2021 for the termination of Lesnik's

appointment and for review of her decision as to the reallocation of custody in the summer of 2021 to accommodate Plaintiff's vacation plans. The trial court denied both motions, and conflict between Lesnik and Defendant seemingly continued through October of the same year, with Defendant continually alleging Lesnik's preferential treatment of Mother.

On 8 October 2021, Plaintiff made a *Motion to Modify Child Custody*, citing, *inter alia*, Defendant's interference with the children's therapy appointments and insufficient attentiveness to the children's medical needs as the basis for modification. After entering the two aforementioned temporary orders on 12 January 2022 and 9 February 2022, the trial court entered its *Order Modifying Child Custody* on 8 July 2022, which severely decreased Defendant's time with the children and delegated "final decision-making authority" on all major parenting decisions to Plaintiff:

FINDINGS OF FACT

1. Plaintiff is a resident of Wake County, North Carolina.

2. Defendant is a resident of Wake County, North Carolina.

3. [] Plaintiff and [] Defendant were married to each other on [26 May] 2007 and separated from each other on or about [23 September] 2016.

4. There were two children born of the marriage, . . . born [10 December] 2008[] and . . . [8 September] 2010.

5. A permanent custody order was entered on [30 October] 2020.

6. The parties' first parent coordinator was Dr. Kari Lenox.

7. Tiffany Lesnik was appointed the Parent Coordinator on [15 December] 2020. Her term expired on [15 December] 2021.

8. On [24 September] 2021, the PC filed a report to the Court detailing numerous problems with the current custody order and requesting an expedited hearing.

9. After a hearing on [27 October] 2021, the Court entered a temporary custody order giving [] Plaintiff sole legal custody and primary physical custody, with [] Defendant exercising alternate-weekend visitation.

10. A second Parent Coordinator report was filed on [8 December] 2021.

11. After a hearing on [10 January] 2022, the Court entered a new temporary custody order and appointed Lisa LeFante as the new Parent Coordinator on [9 February] 2022.

12. There is an ongoing conflict between the parties that is interfering with important decisions being made that affect the health, education and welfare of the minor children.

13. The case continues to be a high-conflict and the parties have had three different parent coordinators.

14. [] Defendant at times will refuse to respond to Plaintiff's requests for information in a timely manner.

15. During Ms. Lesnick's tenure as PC, [] Defendant refused or delayed providing information that the PC requested, and he was hostile and behaved inappropriately in his responses to the PC. Specifically:
   a. On or about [9 April] 2021, the PC contacted [] Defendant and asked for some basic information about his positive COVID test, including when he tested

positive, whether anyone else lived with him, and if anyone in his home had tested positive. The PC's questions were reasonable under the circumstances.
b. Defendant reacted with hostility, refusing to respond to the questions, demanding to know why she needed medical information, accusing the PC of breaching his trust, calling her questions "bizarre," and accusing the PC of colluding in a "witch hunt" with Plaintiff.
c. Defendant ultimately provided answers to the PC's questions after several days, but his delay in responding was unreasonable and his hostile response was inappropriate.
d. On [23 September] 2021, [] Defendant contacted [] Plaintiff claiming he was dealing with a "behavioral issue" with [the parties' elder son] and wanting to review the phone and text logs for [that son's] phone.
e. When the PC contacted the parties and asked Mr. Durbin to provide some information on what the "behavioral issue" was so that the parties could address it in a uniform manner, Defendant refused to provide any information. Further, Defendant's response on [24 September] 2021, at 9:40 a.m., was hostile, telling the PC neither she [n]or Plaintiff were "ready for co-parenting," accusing the PC of lying, and threatening to "limit or cease [his elder son's] cell phone usage" if he didn't get what he wanted.

16. Both minor children attend therapy. [The parties' elder son] sees Dr. Brian Mackey and [the parties' younger son] sees Dr. Jennifer Hayden. Both children have good relationships with their therapists.

17. There were substantial problems with scheduling regular therapy for the minor children for several months in 2020. Defendant was uncooperative with both Dr. Lenox and Ms. Lesnick in the PC's attempts to ensure that [the parties' elder son] was receiving regular therapy.

18. The current PC, Lisa LeFante, did not testify that problems continued under her tenure with Defendant making sure that [the parties' elder son] attended regular

therapy.

19. Both Dr. Mackey and Dr. Hayden testified that the scheduling problems were resolved and that [] Defendant now brings both children to therapy and seems supportive of their treatment.

20. Over Plaintiff's objections, [] Defendant began requiring the children to speak with Plaintiffs estranged mother, who lives in California and suffers from severe mental illness.

21. There has been an ongoing dispute between the parties about the children's medical conditions and the consistent administration of prescribed medications. Specifically:

    a. [The parties' elder son] has asthma and serious allergies requiring him to use inhalers on a regular basis and to carry an EpiPen and emergency inhaler at all times. [The elder son's] medication is kept in a blue bag that he carries with him at all times.

    b. [] Plaintiff and her husband testified that they have been in [the elder son's] presence when he was with [] Defendant on several occasions and they did not see the medication bag, so they presumed that it was not with [him]. Defendant testified that the bag was always there, but sometimes it was in a backpack. The Court does not have sufficient information to determine whether the medication was present or not.

    c. [] Plaintiff had contacted the PC on more than one occasion to voice concerns about Defendant's failure to administer the child's medication as prescribed.

    d. Plaintiff and her husband testified that on at least 4 occasions, when [the parties' elder son] returned from visits with Defendant, that the count on his inhaler (which has a dosage counter on the medication) was inconsistent with the number of doses he should have taken while in Defendant's custody.

    e. [] Defendant offered no explanation, but it appears to the Court that he takes a "hands off" approach and lets [the parties' elder son] regulate his own medication.

    f. The Court finds that, in light of [the elder son's]

medical condition, it is in the child's best interest for both parents to take responsibility for making sure that he takes his medicine consistent with the doctor's recommendations and not leave it to the child to be responsible for his own medications.

g. On [29 July] 2021, the PC issued a directive on the medication issue. The email said, in relevant part, "I am going to ask you both to keep a medication administration chart while [your elder son] is with you that will indicate: The medication administered, the amount, the date and the time."

h. Despite [the elder son's] diagnosed medical problems, and the PC's directive, the conflict over the child's medication continued. Defendant did not maintain the medication log, made the child maintain the medication log, told Plaintiff and the PC that the child (who is 12) was responsible for his own medication, and argued with both Plaintiff and PC in multiple emails rather than simply make sure [the elder son] received his medication and maintaining the log so that both parents could make sure that they were consistent and coordinated in their administration of medication for [him].

i, [The parties' younger son] broke his arm while zip-lining.

22. Defendant did not cooperate with Ms. Lesnik's directives regarding [his elder son's] medication.

23. Plaintiff wanted to get the children vaccinated for Covid 19. [] Defendant disagreed and wanted to speak to the children's pediatrician and allergist.

24. Defendant received recommendations from the pediatrician (Dr. Fennell) regarding the Covid vaccine. Defendant's recollection of the doctor's recommendations, and what he told Plaintiff about it, were different from what the doctor had actually said and provided in correspondence to Defendant. This caused further conflict between the parties and substantially delayed Plaintiff's ability to get the kids vaccinated.

25. Defendant schedules extracurricular activities during Plaintiff's custodial time without her consent.

26. Plaintiff frequently presumes any delay of information or mistake in providing information is intentional on the part of [] Defendant. While the Court believes that delays and mistakes by Defendant in providing information to Plaintiff creates more conflict between the parties, so does Plaintiff's presumption.

27. The amount of conflict between the parties is not in the children's best interest, but neither party seems capable of reducing the conflict.

28. Since the entry of the [12 January] 2022, temporary order, there have been fewer custodial exchanges between the parties. The reduction in exchanges has helped reduce some of the conflict between the parties.

29. Defendant and his mother both testified that the boys seem "sad" to him. However, [the parties' elder son] is doing so well in therapy that he can decrease the frequency of his appointments.

30. Plaintiff and her husband testified to very positive relationships with the children.

31. [] Plaintiff has remarried . . . . Her new husband has a very positive and close relationship with the children.

32. The Court finds that the above listed findings constitute a substantial change in circumstances warranting the entry of a temporary custody order modifying the terms of the October 2020 Permanent Custody Order.

### CONCLUSIONS OF LAW

1. The parties are properly before the Court and that the Court has jurisdiction over the parties and the subject matter herein and there exist facts justifying this Court to

assume jurisdiction to determine the custody of the minor children.

2. North Carolina is the home state of the minor children.

3. Pursuant to N.C.G.S. § 50-13.7, since the entry of the last custody order there has been a substantial change in circumstances that adversely affects the minor children and a modification of the permanent custody order is warranted.

4. This Order is in the best interests of the minor children.

5. Both parties have the ability to comply with the terms and conditions contained herein.

6. Findings of Facts that are more appropriately considered Conclusions of Law are incorporated by reference as if fully set forth herein.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED as follows:

1. The permanent custody order is modified as follows:
   a. The parties shall continue to share joint legal custody, The parties shall in good faith confer and attempt to mutually agree on major decisions affecting the children's health, education and welfare.  In the event the parties are unable to reach mutual agreement on a major decision, [] Plaintiff shall have final decision-making authority.  Day-to-day decisions shall be made by the custodial parent.
   b. [] Plaintiff shall exercise primary physical custody and [] Defendant shall have visitation as follows:
      i. Defendant shall have custody of the minor children on alternate weekends from the end of school Friday until the beginning of school Monday morning.
      ii. In the event one child does not have school on a custodial exchange day (either Friday or Monday), the parties shall exchange custody of both children—the child who is in school and the child who is not in

school—at 5 p.m. on that regular exchange day.

c. Therapy: The minor children shall continue in therapy at 3C Family Services until such time as their individual therapists release each child from therapy. Neither parent shall take any action to terminate or interfere in the therapeutic relationship. In addition:

i. The parents may participate in the children's therapy as directed by the individual therapist.

ii. The children's individual therapists shall recommend the frequency and duration of appointments for each child and the parties shall comply with the recommendation.

iii. Appointments shall be scheduled for each child to comply with the therapist's recommendations, regardless of whose custodial time the appointment may fall on. The custodial parent shall transport the child to and from the therapy appointment as scheduled. In the event there is a dispute between the parties on the day or time a therapy appointment is to be scheduled, the Parent Coordinator shall determine the time and date of the appointment.

d. Medication: The parties shall comply with the Parent Coordinator's directive on medication for the children. Specifically, the parties shall maintain a medication log for [the parties' elder son] as outlined in the [24 August] 2021, directive issued by the Parent Coordinator. Neither parent shall make the child complete the log, or make the child responsible for maintaining his own medication schedule. Both parents shall ensure that the children take any and all medication as prescribed by their respective medical providers, including but not limited to making sure that Epipens and inhalers are available to the child as directed by the physician(s).

e. The parents shall subscribe to Our Family Wizard within 5 days of entry of this order. All communication between the parties shall be through Our Family Wizard and all medical appointments and extracurricular activities shall be placed on the OFW calendar. In the event of an emergency involving a child, the parties may text one another.

f. [] Defendant shall not threaten, insult or harass the

Parent Coordinator, and shall not use abusive language in his communication with her (i.e., calling her a liar). Neither party shall record the Parent Coordinator.

2. <u>Holiday Custodial Schedule</u>. The holiday/summer custodial schedule as outlined herein shall supersede the regular custodial schedule listed above. After the holiday/summer schedule concludes, the regular custodial schedule listed above shall continue as if the holiday/summer schedule never occurred. While [the parties' younger son] remains enrolled at The Raleigh School, the parties shall use [] The Raleigh School calendar to determine the dates of the holidays referenced in provisions (3a) to (3f), below. Once [the parties' younger son] is no longer attending The Raleigh School, the parties shall use the WCPSS calendar to determine the dates of holidays and school breaks.

. . . .

3. <u>Transportation</u>. Each parent will be responsible for picking up the children at school, the residence of the other parent, or child's activity to begin his or her custodial time with the children.

4. Lisa LeFante shall remain the parent coordinator until the expiration of her term. Either party may ask for the reappointment of Ms. LeFante or another parent coordinator at the expiration of her term.

5. <u>Medical Emergencies</u>. In the event of a medical emergency, the party who is with the minor child shall promptly notify the other parent as soon as it is practicable to do so. If any injury, accident or health-related problem arises which necessitates the hospitalization of the child, both parties shall have the right to visit the child at reasonable times for reasonable periods of time. Defendant and Plaintiff shall promptly notify the other of any serious illness and/or injury to the child which requires medical attention. Each party shall inform the other of any medical or health problems which arose while the child is in the

physical custody of one of the parents.

6. Both parents shall provide each other with any medication which the child is taking at the time of the transfer of physical custody of the child and they shall provide each other with sufficient information to allow the other party to obtain refills of that medication, if appropriate.

7. Non-disparagement. [] Defendant and Plaintiff each will endeavor, in good faith, to enhance and nourish the relationship between each other and the children. Each party will attempt to foster feelings of affection between the child(ren) and the other party, and neither party shall do anything to estrange the child(ren) from the other party or to injure the child(ren)'s opinion of the other party in any manner. Neither party shall disparage the other parent within hearing of the minor children or allow any third party to do so. Neither party shall discuss the litigation with the children.

8. Child-Related Activities and Appointments. Each party shall provide to the other party information concerning a child's activities and each shall encourage participation by the other parent. Neither party shall schedule activities for a child during the other party's custodial time without prior consent, and any programs or enrollments by a child which may involve significant time commitments by the other parent shall be agreed upon in advance. If one parent schedules an appointment (medical, therapy, school conference, etc.) for a child, that parent shall immediately notify the other parent so that parent may attend.

9. Access to Information. Both parents shall have equal access to all personnel at the school and shall be permitted to communicate directly with those persons without interference by the other parent. It is the responsibility of each parent to obtain report cards and interim grade reports directly from the school and not rely on the other parent. For any written documents for which there cannot be duplication (school work, progress chart, weekly folders,

and the like) the parent in possession shall make copies for the other parent of any and all important documents and/or documents with deadlines. Both parents shall have equal access to all opportunities for field trips, chaperoning, parent participation at school functions, PTA and the like, and no parent shall interfere with the other parent's right or ability to participate.

10. <u>Telephone and Electronic Contact</u>. Each parent shall be entitled to communicate with the children via telephone, email, text, IM, Skype, twitter, Facebook or any other age-appropriate electronic means. All such communication shall be at reasonable times and at reasonable periods of the day.

11. <u>Records</u>. Each parent shall be entitled to immediate access to any third-party records and information pertaining to the child including, but not limited to, medical, dental health, school or educational records.

12. <u>Travel</u>. Should either parent plan to take the child out of North Carolina, that parent shall inform the other forty-eight (48) hours in advance of the planned travel and shall inform the other of the destination, address and telephone number; in the event such travel is not planned in the 48-hour time frame, the traveling parent shall inform the other immediately at the time the plans are made. Should cither parent wish to take a child out of the country, that parent shall inform the other 30 days in advance of the planned travel and shall fully inform the other parent of the complete itinerary of the travel and provide contact information, including telephone numbers. Both parents shall cooperate in obtaining passports for the children. At the request of the traveling parent, the non-traveling parent shall execute any consent forms or other written documents necessary.

13. <u>Relocation</u>. Should either party decide to relocate outside of Wake County or more than 20 miles from his or her current residence, that party shall notify the other at least 90 days in advance of such a move, or if relocation is

likely to occur in less than 90 days, the party wishing to relocate shall notify the other within twenty-four hours of being informed (or making a decision) that relocation must or is likely to occur. If the relocation takes a parent thirty (30) or more miles from his or her current residence, the children shall remain in the physical custody of the non-relocating parent pending further agreement of the parties or entry of a court order. Both parties will discuss changes in the custodial schedule that will benefit the children. In the event the parties cannot agree upon changes to the custodial schedule, the parties shall participate in mediation as soon as practicable after the notice, but within 30 days from the notice of relocation. In the event no agreement is reached in mediation, but as soon as practicable following the declaration of an impasse, but within thirty (30) days, the parties shall participate in arbitration regarding the custody issue, as set out herein.

14. All PC Directives previously issued and not otherwise modified by the provisions of this order shall remain in effect.

15. This cause is retained by the Court for entry of further Orders.

Defendant timely appeals from the 8 July 2022 order.

## ANALYSIS

Defendant argues the trial court erred in entering its 8 July 2022 order because no substantial change in circumstances affecting the children's wellbeing existed, because modification was not in the best interests of the children, and because the order improperly delegated *de facto* sole custody to Plaintiff. As we agree the order was not entered pursuant to a substantial change in circumstances affecting the children's wellbeing, we reverse.

When reviewing the modification of a child custody order, we "must examine the trial court's findings of fact to determine whether they are supported by substantial evidence." *Shipman v. Shipman*, 357 N.C. 471, 474 (2003) (citations omitted). Unopposed findings of fact "are presumed to be supported by the evidence and are binding on appeal," *James v. Pretlow*, 242 N.C. 102, 104 (1955) (marks and citations omitted), while conclusions of law are reviewed de novo. *In re C.B.C*, 373 N.C. 16, 19 (2019). Whether a substantial change in circumstances has occurred and whether that change affected the minor children are conclusions of law and must be supported by the trial court's findings of fact. *Shipman*, 357 N.C. at 475; *see also Cox v. Cox*, 238 N.C. App. 22, 26 (2014) ("The trial court's conclusions of law must be supported by adequate findings of fact.").

Here, the trial court's findings of fact begin with general observations that this case is, and continues to be, high-conflict. The order then notes that a variety of conflicts and developments have occurred since the entry of the 2020 order: the management of the case shifting between three separate parenting coordinators; defendant responding slowly to requests for information by Plaintiff and one of the parenting coordinators; "hostile" behavior by Defendant toward the same parenting coordinator; Defendant exposing the children to Plaintiff's estranged mother, the boys' maternal grandmother; an ongoing dispute as to the administration of the eldest child's asthma medication; the parties' younger son having broken his arm; Defendant having scheduled activities during Plaintiff's custodial time; Defendant

and Plaintiff disagreeing as to the appropriateness of the children receiving Covid vaccines; Plaintiff remarrying; and Plaintiff assuming bad faith on the part of Defendant.[1] The order then notes that the decreased reduction in custodial changes since the entry of the 12 January 2022 temporary order "has helped reduce some of the conflict between the parties," concludes as a matter of law that a substantial change in circumstances affecting the children had occurred, and orders, *inter alia*, that Defendant's custodial time be permanently reduced to alternate weekends and that Plaintiff have "final decision-making authority" on "major decisions affecting the children's health, education and welfare."

Accepting, as we must, the trial court's unchallenged finding of fact, *see James*, 242 N.C. at 104, we do not believe the trial court's findings of fact actually demonstrated a substantial change in circumstances affecting the welfare of the children. At the threshold, we note that the absence of meaningful findings as to the circumstances as they existed at the time of the 30 October 2020 consent order makes our review difficult, as we cannot determine with certainty what the circumstances, as the trial court determined them to be, were *at the time of that order*. *Cf. Benedict v. Coe*, 117 N.C. App. 369, 377 (1994) ("[T]he [modified order] contains no findings as to the existing circumstances [at previous points in time]. It contains no findings of

---

[1] The order also notes that Defendant was "uncooperative" with the parenting coordinator's requests that the eldest child regularly attended therapy. However, further findings of fact clarify that this problem had been resolved at the time of the order's entry.

changed circumstances since these dates."), *disapproved of on other grounds by Pulliam v. Smith*, 348 N.C. 616 (1998); *see also Woodring v. Woodring*, 227 N.C. App. 638, 645 (2013) (marks and citations omitted) ("[W]hen evaluating whether there has been a substantial change in circumstances, courts may only consider events which occurred after the entry of the previous order, unless the events were previously undisclosed to the court."). Nonetheless, our review of the record and the findings in the modified order present us with information sufficient to make a determination on the question of whether a substantial change in circumstances affecting the welfare of the children occurred.

In determining whether the trial court's findings of fact support a substantial change in circumstances affecting the welfare of the children, we review two of our recent custody modification cases, *Smith v. Dressler*, __ N.C. App. __ (2023), and *Conroy v. Conroy*, __ N.C. App. __ (2023), which are particularly instructive, as both cases turned on the issue of whether a substantial change in circumstances had occurred. In *Smith*, the trial court had entered a modified custody order concerning the parties' minor child, citing among the purportedly changed circumstances that the plaintiff had "married, given birth to a child, been honorably discharged from the Air Force, returned to North Carolina, acquired a home in Wilson, gained proximity to and more support from her family, and been re-employed by Pfizer," as well as that the defendant did not schedule visitation time with some members of the plaintiff's family. *Smith*, __ N.C. App. at __. The trial court also noted that the minor child had

received a number of injuries while under the defendant's supervision—injuries the plaintiff alleged indicated abuse or neglect on the part of the defendant—and that the defendant had not disclosed a potential Covid infection. *Id.* at __. We also noted that "CPS [] found no evidence of abuse after investigating [the] [f]ather at [the] [m]other's behest," which was a factor the trial court had used when deciding whether a substantial change in circumstances had occurred. *Id.* at __.

We vacated and remanded the order on the basis that no substantial change of circumstances existed. *Id.* at __. The plaintiff's marriage, new child, discharge from the Air Force, and changes in living arrangements and employment had already been disclosed to the trial court prior to the entry of the previously-effective custody order; therefore, they did not qualify as substantially changed circumstances since the entry of the prior order. *Id.* at __ ("[T]he trial court erred when it considered and re-evaluated events which were disclosed to and considered by the trial court prior to the entry of the First Custody Order.") (citing, *inter alia*, *Woodring*, 227 N.C. App. at 645, and *Ford v. Wright*, 170 N.C. App. 89, 96 (2005)). Considering only the remaining changes in circumstances—the injuries to the child alleged to constitute abuse or neglect—we rejected the plaintiff's argument that a substantial change in circumstances affecting the welfare of the child had occurred, noting the absence of evidence that the injuries to the child were the product of abuse or neglect. *Id.* at __. Moreover, we further remarked that, even if we considered the evidence previously disclosed and addressed in the prior order, that information would not have been

sufficient to constitute a substantial change in circumstances affecting the welfare of the child. *Id.* at __.

By contrast, in *Conroy v. Conroy*, the trial court's findings of fact supporting a substantial change in circumstances included an escalating pattern of the plaintiff's increasingly erratic behavior. While the trial court found that the plaintiff "expressed significant disdain and contempt for [any] person that she apparently perceived to be 'against' her," *Conroy*, __ N.C. App. at __, the primary thrust of the trial court's order concerned her extreme behaviors toward her children and the defendant. These behaviors included blaming her thirteen-year-old daughter for issues raised to the trial court; speaking about the defendant in expletives in the presence of the children; preventing the children going on a pre-planned trip with the defendant by locking them inside the home; threatening to call the police on the defendant while her daughter was riding to soccer practice with the defendant; attempting, in bad faith, to have the defendant ejected from one of their children's basketball games; cursing at, and taking the call phone of, one of her children's friends for remarks made in the wake of the November 2020 presidential election[2]; destroying the children's

---

[2] For more complete context, the entirety of the trial court's finding of fact with respect to this incident was as follows:

> Following the election of Joe Biden in November 2020, [the plaintiff] became offended by a comment made by one of [her son]'s friends. [The plaintiff] responded by telling the child in the presence of her own minor children that he had "no friends;" by calling him names, including a "little shit;" and by confiscating and keeping the child's cell

electronics in front of them as a means of punishment; *choking her daughter*; encouraging the children to bully one another; and engaging in otherwise excessive corporal punishment. *Id.* at __.

Although the plaintiff in *Conroy* argued that these behaviors did not constitute a substantial change in circumstances because her interpersonal relationships had always been poor and her behavior toward the defendant had been "erratic and unpredictable" since at least the entry of the original custody order, *id* at __, we held that the parties' "continued communication problems and their failure or inability to cooperate and co-parent constituted a substantial change." *Id.* at __. In doing so, we relied primarily on the following excerpt from *Laprade v. Barry*:

> It is beyond obvious that a parent's unwillingness or inability to communicate in a reasonable manner with the other parent regarding their child's needs may adversely affect a child, and the trial court's findings abundantly demonstrate these communication problems *and* the child's resulting anxiety from her father's actions. While father is correct that this case overall demonstrates a woeful refusal or inability of both parties to communicate with one another as reasonable adults on many occasions, we can find no reason to question the trial court's finding that these communication problems are *presently* having a negative impact on [the minor child's] welfare that

---

phone. Bizarrely, [the plaintiff] brought this child's mother[] . . . in to testify on her behalf. [The mother] testified that her son was so afraid of [the plaintiff] after the [i]ncident that her husband had to go to [the plaintiff's] home to retrieve their son's cell phone on their son's behalf. Throughout her own and [the other mother's] testimony, [the plaintiff] completely failed to recognize any problem with her own behavior (directed at a child) and, instead, blamed said child for "provoking" her.

*Conroy*, __ N.C. App. at __.

> constitutes a change of circumstances. In fact, it is foreseeable the communication problems are likely to affect [the minor child] more and more as she becomes older and is engaged in more activities which require parental cooperation and as she is more aware of the conflict between her parents. Therefore, we conclude that the binding findings of fact support the conclusion that there was a substantial change of circumstances justifying modification of custody.

*Laprade v. Barry*, 253 N.C. App. 296, 303-04 (2017) (emphasis in original) (citing *Shipman*, 357 N.C. at 473-75); *id.* at __.

To be sure, the facts of this case fall in a gray area between *Smith* and *Conroy*. Like the plaintiff in *Smith*, Plaintiff's arguments to the trial court included a range of allegations that Defendant had mishandled the health of one of the children, including allegedly unsafe conduct during the height of the pandemic. *Smith*, __ N.C. App. __. And, also as in *Smith*, a contributing factor in the trial court's conclusion that a substantial change affecting the welfare of the children had occurred was Plaintiff's remarriage. *Id.* at __. However, these circumstances alone, especially in the absence of a finding of the remarriage's impact on the minor children's wellbeing, does not constitute a substantial change in circumstances.[3] *See id.* at __; *see also Hassell v. Means*, 42 N.C. App. 524, 531 ("Remarriage in and of itself is not a sufficient change of circumstance to justify modification of a child custody order."), *disc. rev. denied*, 298 N.C. 568 (1979); *Kelly v. Kelly*, 77 N.C. App. 632, 636 (1985) ("Remarriage

---

[3] We also note that the Plaintiff's remarriage had occurred in March 2019, well before the entry of the October 2020 consent order.

without a finding of fact indicating the effect of remarriage on a child is not a sufficient change of circumstance to justify modification of a child custody order."). Moreover, like in *Smith*, ordinary injury and response to common illness are not themselves sufficient to constitute a substantial change in circumstances affecting the wellbeing of the children. *Smith*, __ N.C. App. at __.

Meanwhile, this case also shares a number of salient features with *Conroy*, most notably in the trial court's observation of deteriorating communication between the parties. Defendant, like the plaintiff in *Conroy*, has, according to the trial court's findings, developed a contentious relationship with, and wariness of, other participants in the case,[4] *see Conroy*, __ N.C. App. __, and has reacted negatively toward them on a number of occasions. Similar to the findings of fact in *Conroy*, the trial court described decision-making conflicts over major parenting decisions between the parties as "ongoing" and noted the "case continue[d] to be high-conflict"; however, unlike in *Conroy*, a significant portion of the negative communications

---

[4] Including, perhaps, the trial court:

> [DEFENDANT'S COUNSEL:] . . . I'm going to implore you to please, you know, give Mr. -- give what Mr. Durbin says a fair shake. I know that he's been in front of you several times and you've been very displeased with him in past hearings, but I'm asking for you to let that go for a little bit, listen to what he says, and take it seriously. Thank you.

> THE COURT: For the record, the Court will note that the court listens to all parties in every hearing, takes everything' seriously, and makes decisions upon the evidence. So the Court will take exception to the statement otherwise.

noted by the trial court in its findings of fact were directed at, or involved, the parenting coordinator. Also unlike in *Conroy*, no specific findings linked the parties' negative communication to the wellbeing of the children; and, in fact, the instances of conflict actually discussed by the trial court all appear to have been communications to which the children were not privy. *But see Conroy*, __ N.C. App. at __ (noting among the trial court's findings of fact that the plaintiff's "significant disdain and contempt for" others, including that voiced in front of the minor children, involved in the case resulted in direct distress to—and, at times, punishment of—the minor children); *Laprade*, 253 N.C. App. at 301 (noting among the trial court's findings of fact that the defendant's behavior toward the child with relation to the parties' conflicts led to high anxiety in the parties' minor child).

Indeed, the only findings directly concerning the children's wellbeing with relation to the parties' conflicts were the broad observations in findings 27 through 29.[5] These findings, however, relate to the reduction in conflict between the parties

---

[5] These findings read, in full, as follows:

> 27. The amount of conflict between the parties is not in the children's best interest, but neither party seems capable of reducing the conflict.

> 28. Since the entry of the [12 January] 2022, temporary order, there have been fewer custodial exchanges between the parties. The reduction in exchanges has helped reduce some of the conflict between the parties.

> 29. Defendant and his mother both testified that the boys seem "sad" to him. However, [the parties' elder son] is doing so well in therapy that he can decrease the frequency of his appointments.

and not to any specific impact on the wellbeing of the children, limiting the relation between the two to a cursory note about conflict not being in the children's best interest. The only finding of the three involving the wellbeing of the children pertains to the eldest son's progress in therapy—treatment which, by the trial court's own findings, was supported without conflict by both parties as of the time of the order's entry.

While it may be "obvious that a parent's unwillingness or inability to communicate in a reasonable manner with the other parent regarding their child's needs may adversely affect [the] child," *see Laprade*, 253 N.C. App. at 303, it is also not to be presumed from the mere existence of an ongoing conflict that the conflict adversely affects the child, especially where the trial court's findings of fact actually suggest the children were relatively insulated from the conflict. This is especially true where, as here, both boys are active teenagers approaching adulthood, can articulate their preferences for themselves, and can take far more responsibility for their activities and schedules than a younger child could.

Nor is it the case that conflict between a party and a prior parenting coordinator necessarily constitutes a substantial change in circumstances affecting the welfare of the child. Parenting coordinators serve an important function on behalf of our courts, *see generally* N.C.G.S. § 50-92 (2023), but they are, ultimately,

susceptible to human error and bias, especially when their station requires involving themselves in their assignees' emotionally-charged conflicts. Such susceptibility is especially present when a disparity exists in the parents' ability to manage the optics of the communications to which the parenting coordinator is exposed and advantageously leverage the necessary, yet inorganic, rules of engagement presented by court-ordered custodial arrangements. For this reason, conflict between a party and a parenting coordinator is not *per se* evidence of impact on minor children whose custody is involved in that case. Were it otherwise, a trial court may be tempted to modify a custody order out of mere logistical convenience to itself and its coordinator appointees, rather than acting with due concern for a disfavored parent's "fundamental right to make decisions concerning the care, custody, and control of his or her children . . . ." *Adams v. Tessener*, 354 N.C. 57, 60 (2001) (marks omitted) (quoting *Troxel v. Granville,* 530 U.S. 57, 66 (2000)).

The trial court's conclusion that "there has been a substantial change in circumstances that adversely affects the minor children" is not supported by its findings of fact; we therefore reverse the trial court's modification order. *Ford*, 170 N.C. App. at 96. Having so held, Defendant's arguments as to the best interests of the children and the legal status of the custodial arrangement ordered by the trial court are moot. *Roberts v. Madison Cty. Realtors Ass'n, Inc.*, 344 N.C. 394, 398-99 (1996) (marks and citations omitted) ("A case is moot when a determination is sought on a matter which, when rendered, cannot have any practical effect on the existing

controversy.")

## CONCLUSION

The trial court's modification of child custody was not supported by a substantial change in circumstances affecting the children's wellbeing, and we therefore reverse the order of the trial court. *Ford*, 170 N.C. App. at 96.

REVERSED.

Judge TYSON concurs.

Judge COLLINS dissents by separate opinion.

COLLINS, Judge, dissenting.

I would affirm the trial court's order granting primary decision-making authority and primary physical custody to Plaintiff. I therefore respectfully dissent.

## I. Background

Plaintiff and Defendant were married on 26 May 2007. They had two children together, Charles, born in 2008, and Timothy, born in 2010.[6] On 23 September 2016, the parties separated. They entered into a consent order for child custody and child support on 9 February 2017 ("Initial Consent Order") wherein they agreed to share legal and physical custody of the children and to various other custody terms.

Plaintiff filed a motion to modify child custody on or around 27 October 2020. The trial court entered a consent order on 30 October 2020 ("Permanent Custody Order") maintaining all the terms of the Initial Consent Order but adding a term specifically providing for the appointment of a parenting coordinator. The parties entered into a consent order on 15 December 2020 appointing Tiffany Lesnik ("PC" or "Parenting Coordinator") as their parenting coordinator for a one-year term. The parties gave the PC authority over the following: transition time/pickup/delivery; sharing of vacations and holidays; method of pickup and delivery; transportation to and from visitation; participation in child care/daycare and baby-sitting; bed time; diet; clothing; recreation; before and after school activities; extracurricular activities;

---

[6] We use pseudonyms to protect the identities of the minor children. *See* N.C. R. App. P. 42.

discipline; health care management; alterations in schedule which do not substantially interfere with the basic time share agreement; participation in visitation, including significant others and relatives; telephone contact; alterations to appearance, including tattoos or piercings; the children's passports; and education.

Defendant filed motions on 30 April 2021 to modify or terminate the PC's appointment as their parenting coordinator and for an expedited review of two of the PC's decisions concerning the parties' summer 2021 custodial schedule. In June 2021, Defendant filed a motion for attorney's fees and for apportionment of the PC's fees between the parties. Defendant's motions came on for hearing on 8 July 2021. The trial court entered an order on 2 August 2021 finding, in pertinent part:

> 10. Defendant testified that approximately eight (8) parenting coordinator decisions made between January 14, 2021 and April 13, 2021 created unnecessary confusion and conflict between the parties. Additionally, the decisions concerning the 2021 summer schedule created an unequal distribution of days between the parties which Defendant testified was not the intent of the Custody Order because the Custody Order intends the parties to share equal physical custody of their minor children.
>
> . . . .
>
> 13. The Parent Coordinator's decisions were based on rational and reasonable consideration of the children's best interests, and the Parent Coordinator communicated with the children's school, both parents, and the minor child's therapist in reaching her decisions.
>
> 14. The Parent Coordinator's decisions did not substantially alter the time-sharing arrangement set forth in the custody order.
>
> 15. The Court finds the parenting coordinator's March 1,

2

2021 decision concerning Father's Day weekend and the alterations to the custodial schedule during the summer of 2021 were reasonable.

16. The parties are high conflict.

17. The parties will benefit from the continued services of a parenting coordinator. . . .

The trial court thus declined to modify the PC's decisions, denied Defendant's motion to modify or terminate the PC's appointment, dismissed Defendant's motion for attorney's fees, and held Defendant responsible for the PC's fees related to the hearing.

The PC filed a Parenting Coordinator's report[7] ("first report") on 24 September 2021,[8] alleging problems with the current custody arrangement, requesting a change in custody, suggesting that Defendant undergo a psychological evaluation, and requesting an expedited hearing. A hearing on the report was set for 27 October 2021.

On 8 October 2021, Plaintiff filed a motion to modify child custody, seeking to modify the Permanent Custody Order.

---

[7] "The parenting coordinator may file a report with the court regarding any of the following: (1) The parenting coordinator's belief that the existing custody order is not in the best interests of the child. (2) The parenting coordinator's determination that the parenting coordinator is not qualified to address or resolve certain issues in the case. (3) A party's noncompliance with a decision of the parenting coordinator or the terms of the custody order. (4) The parenting coordinator's fees as set forth in G.S. 50-95. (5) The parenting coordinator's request that the parenting coordinator's appointment be modified or terminated." N.C. Gen. Stat. § 50-97(a) (2021).

[8] The PC's first report is not in the record.

Defendant filed a Motion for Psychological Evaluation on 19 October 2021, moving for an order requiring Plaintiff to submit to a psychological evaluation. Defendant alleged that the PC had filed a report "suggest[ing] Defendant should undergo a psychological evaluation" but that "Plaintiff exhibits many behaviors that are to the detriment of the minor children, and Defendant's ability to co-parent with her" and the "[PC] is, for some reason, hyper focused on Defendant, and refuses to hold Plaintiff accountable for any of her erratic and harmful behavior."

The PC's first report came on for hearing on 27 October 2021. On 8 December 2021, the PC filed a second Parenting Coordinator's report ("second report") with the court detailing problems with the Permanent Custody Order and requesting an expedited hearing.[9] The PC's appointment as the parties' Parenting Coordinator expired on 15 December 2021. The second report came on for hearing on 10 January 2022.

By order entered 11 January 2022, the trial court appointed Lisa Lefante as the parties' parenting coordinator for a term of two years. The order noted that the parties had not consented to the appointment of a parenting coordinator, that the matter was a high-conflict case, and that the appointment of the parenting coordinator was in the best interests of the children. The second parenting

---

[9] The PC's second report is not in the record.

4

coordinator had the same scope of authority as the PC, with the addition of authority over the minor children's therapy.

The following day, 12 January 2022, the trial court entered a Temporary Order for Child Custody ("First Temporary Order") based upon its hearing of the PC's first report. The trial court found, in relevant part, as follows:

> 8. There is an ongoing conflict between the parties that is interfering with important decisions being made that affect the health, education and welfare of the minor children.
>
> 9. On or about April 9, 2021, the PC contacted the Defendant and asked for some basic information about his positive COVID test, including when he tested positive, whether anyone else lived with him, and if anyone in his home had tested positive. The PC's questions were reasonable under the circumstances.
>
> 10. Defendant reacted with hostility, refusing to respond to the questions, demanding to know why she needed medical information, accusing the PC of breaching his trust, calling her questions "bizarre," and accusing the PC of colluding in a "witch hunt" with Plaintiff.
>
> 11. Defendant ultimately provided answers to the PC's questions after several days, but his delay in responding was unreasonable and his hostile response was inappropriate.
>
> 12. On September 23, 2021, the Defendant contacted the Plaintiff claiming he was dealing with a "behavioral issue" with [Charles] and wanting to review the phone and text logs for [Charles's] phone.
>
> 13. When the PC contacted the parties and asked Mr. Durbin to provide some information on what the "behavioral issue" was so that the parties could address it in a uniform manner, Defendant refused to provide any information. Further, Defendant's response on September 24, 2021, at 9:40 a.m., was hostile, telling the PC neither

5

she [n]or Plaintiff were "ready for co-parenting," accusing the PC of lying, and threatening to "limit or cease [Charles's] cell phone usage" if he didn't get what he wanted.

14. Defendant's response was unproductive and hostile and the Court has serious concerns about his ability to coparent with the Plaintiff.

15. There are issues with the children attending therapy as recommended. Specifically:

a. The minor children are both in therapy at 3C Family Services. [Charles's] therapist is Brian Mackey. [Timothy's] therapist is Jennifer Hayden. Both children have attended therapy regularly for over a year and both children have a good rapport with their individual therapists.

b. Dr. Mackey, [Charles's] therapist, had recommended that [Charles] attend therapy weekly. [Charles] suffers from anxiety.

c.

d. There have been ongoing problems scheduling appointments for [Charles] during the Defendant's custodial time going back to October 2020. The Defendant complained about appointments being scheduled during his custodial time or scheduled during school hours.

e. As a result of the conflict, [Charles] had numerous cancelled therapy appointments during 2021 and as of the hearing date, half of all remaining therapy appointments were cancelled for the rest of the year.

f. Defendant was previously held in contempt for interfering with the children's therapy.

g. The Court finds that it is immaterial whose custodial time the children's therapy appointments are scheduled on, so long as the children are receiving therapy as directed by the therapists.

16. There has been an ongoing dispute between the parties

about the children's medical conditions and the consistent administration of prescribed medications. Specifically:

> a. [Charles] has asthma and serious allergies requiring him to use inhalers on a regular basis and to carry an Epipen at all times.

> b. The Plaintiff had contacted the PC on more than one occasion to voice concerns about Defendant's failure to administer the child's medication as prescribed.

> c. On July 29, 2021, the PC issued a directive on the medication issue. The email said, in relevant part, "I am going to ask you both to keep a medication administration chart while [Charles] is with you that will indicate: The medication administered, the amount, the date and the time."

> d. Despite [Charles's] diagnosed medical problems, and the PC's directive, the conflict over the child's medication continued. Defendant did not maintain the medication log, made the child maintain the medication log, told Plaintiff and the PC that the child (who is 12) was responsible for his own medication, and argued with both Plaintiff and PC in multiple emails rather than simply make sure [Charles] received his medication and maintaining the log so that both parents could make sure that they were consistent and coordinated in their administration of medication for [Charles].

> e. Defendant's refusal to comply with the PC's directive had an adverse effect on [Charles's] health and was not in the child's best interest.

17. The minor children attend two different schools. [Charles] attends Oberlin Middle School while [Timothy] attends The Raleigh School. The schools operate on two slightly different schedules when it comes to teacher workdays and holidays so that there are instances when one child does have school and the other does not on a specific day or days.

18. While the order is clear that the Raleigh School

calendar controls for determining holiday and vacation days for the children, there have been repeated disputes and problems with determining custodial exchange times and days. This conflict over the school schedules has served to increase the conflict between the parties.

19. The Defendant has been hostile to the Parent Coordinator. He has frequently resorted to calling her a liar, threatened to file grievances with the State Bar, has responded to the PC's questions about mundane issues with transcripts of prior court hearings and claims that the PC has lied, misled the court, colluded with Plaintiff and Plaintiff's counsel.

20. Defendant's aggressive and hostile responses to the PC are inappropriate. The Court previously found that the PC was acting appropriately and was to remain in place until the end of her appointed term. The PC is due cooperation and respect from both parties, and the appropriate response of a party to a disagreement with the PC is to bring it to the Court, not to attempt to threaten and intimidate the Parent Coordinator.

21. The parties['] inability to communicate with one another effectively make it appropriate to require them to utilize Our Family Wizard for all non-emergency communications.

22. The Court finds that the above listed findings constitute a substantial change in circumstances warranting the entry of a temporary custody order modifying the terms of the October 2020 Permanent Custody Order.

Upon these findings, the trial court concluded that "it is appropriate and in the best interests of the minor children to enter a temporary custody order."[10]  The trial

---

[10] *See* N.C. Gen. Stat. 50-97(d) (2021) ("The court, after a hearing on the parenting coordinator's report, shall be authorized to issue temporary custody orders as may be required for a child's best interests.").

court thus ordered, in pertinent part, as follows: the parties continue to share joint legal custody but Plaintiff shall have final decision-making authority; Plaintiff have primary physical custody and Defendant have visitation "on alternate weekends from the end of school Friday until the beginning of school Monday morning"; the parties comply with the PC's directive on the children's medication; and Defendant not to threaten, insult, or harass the PC, and not to use abusive language in his communication with her. Any provisions of the Permanent Custody Order and PC directives not modified by the First Temporary Order remained in effect.

The trial court entered another Temporary Order for Child Custody ("Second Temporary Order") on 9 February 2022, based on the 10 January 2022 hearing on the PC's second report. The trial court found, in relevant part, as follows:

> 9. At the prior hearing on the Parent Coordinator'[s] first report to the Court, the Court found that the Defendant was aggressive and threatening toward the Parent Coordinator and ordered him to stop using hostile language and threatening the PC.
>
> 10. Following the hearing on the first PC report the Defendant took the following actions:
>
>> a. Defendant filed a bar grievance against the Parent Coordinator[.]
>>
>> b. Defendant, through counsel, undertook extensive discovery including requests for production of documents requiring the Parent Coordinator to spend more than 10 hours producing hundreds of pages of emails, including all her emails with the Defendant.
>>
>> c. Defendant's counsel noticed the Parent Coordinator to appear and testify at a deposition.

Counsel would not provide the Parent Coordinator, whose term had expired, why having her sit for a deposition would be productive.

d. Defendant threatened to file a motion for sanctions against the Parent Coordinator.

e. Immediately after the last hearing, the Defendant informed the minor children of changes in the custodial schedule prior to any order having been submitted, causing distress to the children. He did not inform the Plaintiff in advance that he was going to tell the children about the litigation.

11. The Defendant has been intent on getting the Parent Coordinator removed, beginning with his Motion to Modify or Terminate Parent Coordinator's Appointment filed on April 30, 2021.

12. The Defendant's actions, including those actions by and through counsel, directed at the Parent Coordinator are, in the Court's view, retaliatory.

13. While the Parent Coordinator has done an excellent job in her role, the Court is concerned that because of the Defendant's tactics and animosity, she cannot be effective in her role going forward. The Court also does not want to expose the Parent Coordinator to further retaliatory actions by the Defendant.

. . . .

20. There is an ongoing conflict between the parties that is interfering with important decisions being made that affect the health, education and welfare of the minor children.

21. The Court finds that the above listed findings constitute a substantial change in circumstances warranting the entry of a temporary custody order modifying the terms of the October 2020 Permanent Custody Order.

Based upon its findings, the trial court concluded that it was appropriate and in the best interests of the minor children to enter a temporary custody order. The

trial court maintained the custody provisions from the First Temporary Order but modified the parenting coordinator.

Plaintiff's motion to modify the Permanent Custody Order came on for hearing on 3 March 2022. By order entered 8 July 2022 ("Order on Appeal"), the trial court concluded that there had been a substantial change in circumstances that adversely affected the minor children since entry of the Permanent Custody Order, and that modification of the Permanent Custody Order was warranted.

The trial court made 32 findings of fact, some with sub-findings; the relevant findings of fact are recited above by the majority. Upon its conclusion that there had been a substantial change in circumstances adversely affecting the minor children since entry of the Permanent Custody Order, and that a modification of the permanent custody order was warranted, the trial court essentially ordered the custody terms of the First Temporary Order and the Second Temporary Order become permanent.

Defendant appealed.

## II.    Analysis

Defendant argues that the trial court erred by concluding that there was a substantial change of circumstances affecting the welfare of the children and that modification was in the best interest of the children, and by awarding primary decision-making authority to Plaintiff.

It is well established in this jurisdiction that a trial

court may order a modification of an existing child custody order between two natural parents if the party moving for modification shows that a substantial change of circumstances affecting the welfare of the child warrants a change in custody. The party seeking to modify a custody order need not allege that the change in circumstances had an adverse effect on the child. While allegations concerning adversity are acceptable factors for the trial court to consider and will support modification, a showing of a change in circumstances that is, or is likely to be, beneficial to the child may also warrant a change in custody.

. . . .

The trial court's examination of whether to modify an existing child custody order is twofold. The trial court must determine whether there was a change in circumstances and then must examine whether such a change affected the minor child. If the trial court concludes either that a substantial change has not occurred or that a substantial change did occur but that it did not affect the minor child's welfare, the court's examination ends, and no modification can be ordered. If, however, the trial court determines that there has been a substantial change in circumstances and that the change affected the welfare of the child, the court must then examine whether a change in custody is in the child's best interests. If the trial court concludes that modification is in the child's best interests, only then may the court order a modification of the original custody order.

When reviewing a trial court's decision to grant or deny a motion for the modification of an existing child custody order, the appellate courts must examine the trial court's findings of fact to determine whether they are supported by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

. . . .

12

In addition to evaluating whether a trial court's findings of fact are supported by substantial evidence, this Court must determine if the trial court's factual findings support its conclusions of law. With regard to the trial court's conclusions of law, our case law indicates that the trial court must determine whether there has been a substantial change in circumstances and whether that change affected the minor child. Upon concluding that such a change affects the child's welfare, the trial court must then decide whether a modification of custody was in the child's best interests. If we determine that the trial court has properly concluded that the facts show that a substantial change of circumstances has affected the welfare of the minor child and that modification was in the child's best interests, we will defer to the trial court's judgment and not disturb its decision to modify an existing custody agreement.

*Shipman v. Shipman*, 357 N.C. 471, 473-75, 586 S.E.2d 250, 253-54 (2003) (quotation marks, brackets, and citations omitted).

## A. Change of Circumstances

When considering a party's request to modify a custody order, "courts must consider and weigh all evidence of changed circumstances which affect or will affect the best interests of the child, both changed circumstances which will have salutary effects upon the child and those which will have adverse effects upon the child. In appropriate cases, either may support a modification of custody on the ground of a change in circumstances." *Pulliam v. Smith*, 348 N.C. 616, 619, 501 S.E.2d 898, 899 (1998). Where "the effects of the change on the welfare of the child are not self-evident," it "necessitate[s] a showing of evidence directly linking the change to the welfare of the child[,]" and requires that "the trial court make findings of fact

13

regarding that connection." *Shipman*, 357 N.C. at 478, 586 S.E.2d at 255, 256 (emphasis omitted).

Defendant argues that no evidence was presented and no findings of fact were made to establish the circumstances that existed in October 2020 when the Initial Custody Order was entered. I agree with the majority that "the Record and the findings in the [Order on Appeal] present us with information sufficient to make a determination on the question of whether a substantial change in circumstances affecting the welfare of the child occurred." Therefore, I too reject Defendant's argument.

Defendant next argues that there was no substantial change in circumstances. I disagree with Defendant's argument and the majority's analysis on this issue.

The trial court's findings show a high level of conflict between the parties, primarily caused by Defendant, that has interfered with important actions being taken and important decisions being made, which has negatively affected the health and welfare of the minor children. Defendant has been uncooperative and hostile toward Plaintiff: Defendant refused to timely respond to Plaintiff's request for information; Defendant began having the children speak with Plaintiff's estranged mother, over Plaintiff's objections; Defendant failed to timely administer Charles's asthma medication and then refused to keep a medication chart detailing the amount, the date, and the time of Charles's medication administration to ensure Charles received his medication; Defendant misrepresented to Plaintiff what the doctor's

14

recommendation was regarding the children's COVID vaccines, delaying them getting vaccinated; and Defendant failed to communicate with Plaintiff before scheduling the children's activities during Plaintiff's custodial time.

Similarly, Defendant was uncooperative and hostile toward the PC: Defendant refused or delayed in responding to the PC's request for information, including refusing to respond to the PC's request for basic information regarding his positive COVID test; Defendant refused to provide the PC with information regarding his son's alleged "behavior issue" and instead told her that neither she nor Plaintiff were "ready for co-parenting"; Defendant was uncooperative with the PC's attempts to ensure that Charles was receiving regular therapy; and Defendant refused the PC's directive to keep a medication chart to ensure that Charles timely and consistently received his asthma medication.

The findings show that Defendant's uncooperative and hostile behavior has negatively affected the children: Charles did not appropriately receive his asthma medication when with Defendant; Defendant's refusal to keep a medication chart to help ensure that Charles consistently received his medication put Charles's health at risk; the children were delayed in receiving their COVID vaccinations; both children are in therapy; and there were difficulties scheduling Charles's therapy. Furthermore, as noted in prior cases, conflict between parents affect children differently as they become older, involved in more activities, and are more aware of the conflicts:

15

> It is beyond obvious that a parent's unwillingness or inability to communicate in a reasonable manner with the other parent regarding their child's needs may adversely affect a child, and the trial court's findings abundantly demonstrate these communication problems and the child's resulting anxiety from her father's actions. While father is correct that this case overall demonstrates a woeful refusal or inability of both parties to communicate with one another as reasonable adults on many occasions, we can find no reason to question the trial court's finding that these communication problems are presently having a negative impact on Reagan's welfare that constitutes a change of circumstances. In fact, it is foreseeable the communication problems are likely to affect Reagan more and more as she becomes older and is engaged in more activities which require parental cooperation and as she is more aware of the conflict between her parents. Therefore, we conclude that the binding findings of fact support the conclusion that there was a substantial change of circumstances justifying modification of custody. This argument is overruled.

*Laprade v. Barry*, 253 N.C. App. 296, 303-04, 800 S.E.2d 112, 117 (2017) (emphasis and citation omitted); *see also Shell v. Shell*, 261 N.C. App. 30, 37, 819 S.E.2d 566, 572 (2018) ("Here, the trial court specifically noted the changes in communication and cooperation since the 2012 order. Although the parties had always had trouble communicating, Father had become even less willing to cooperate with Mother.").

There is no support for the majority's assertion that "the trial court's findings of fact actually suggest the children were relatively insulated from the conflict" and it is naïve to think that the children have been or could be insulated from this conflict. Joint decision making and shared custody–with the children frequently going back and forth between parents–requires a high level of parental cooperation. Just as in

*Laprade*, "it is beyond obvious" here that the high level of conflict caused by Defendant has taken its toll on the children's welfare, including directly impeding Plaintiff's ability to parent and co-parent the children. *Laprade*, 253 N.C. App. at 303-04, 800 S.E.2d at 117. Furthermore, just as in *Laprade*, it is foreseeable that the conflict is likely to continue to affect the children more and more as they become older. *Id.* at 304, 800 S.E.2d at 117.

The trial court also made findings of fact regarding circumstances that positively affected the children. Since the entry of the First Temporary Order, wherein Plaintiff was given primary custody of the children and Defendant given alternate weekend visitation, "there have been fewer custodial exchanges between the parties. The reduction in exchanges has helped reduce some of the conflict between the parties." Furthermore, Charles "is doing so well in therapy that he can decrease the frequency of his appointments." Additionally, Plaintiff has remarried, and her new husband has "very positive relationships with the children." These findings show the "changed circumstances which [had] salutary effects" on the children. *Pulliam*, 348 N.C. at 619, 501 S.E.2d at 899.

The findings of fact are amply supported by the record evidence, including: the hearing testimony; court filings included in the record on appeal, including the Initial Consent Agreement, Permanent Custody Order, First Temporary Order, and Second Temporary Order; and the documentary exhibits, including numerous emails between the parties and between parties and the PC.

17

The majority suggests that the conflict between the Defendant and the PC may have been a result of the PC's "error and bias" and that Plaintiff manipulated the communications with the PC to Plaintiff's advantage.[11]  Essentially, the majority lays the blame for Defendant's conduct on Plaintiff.  There is no basis in the record to support the majority's position and the majority's conjecture was soundly rejected by the trial court in its intermediate orders, none of which are challenged on appeal.

"[I]n custody cases, the trial court sees the parties in person and listens to all the witnesses." *Adams v. Tessener*, 354 N.C. 57, 63, 550 S.E.2d 499, 503 (2001) (citation omitted).  With this perspective, the trial court is able "to observe the demeanor of the witnesses and determine their credibility, the weight to be given their testimony and the reasonable inferences to be drawn therefrom." *Yurek v. Shaffer*, 198 N.C. App. 67, 80, 678 S.E.2d 738, 747 (2009) (citations omitted).  This opportunity of observation "allows the trial court to detect tenors, tones and flavors that are lost in the bare printed record read months later by appellate judges." *Adams*, 354 N.C. at 63, 550 S.E.2d at 503 (quotation marks and citations omitted).

---

[11] The majority writes, "Parenting coordinators serve an important function on behalf of our courts, *see generally* N.C.G.S. § 50-92 (2021), but they are, ultimately, susceptible to human error and bias, especially when their station requires involving themselves in their assignees' emotionally-charged conflicts.  Such susceptibility is especially present when a disparity exists in the parents' ability to manage the optics of the communications to which the parenting coordinator is exposed and advantageously leverage the necessary yet inorganic rules of engagement presented by court-ordered custodial arrangements."

The record in this case includes evidence of Defendant's disruptive litigiousness and the trial court's orders consistently rejecting Defendant's claims. Defendant filed a motion on 30 April 2021 to review two of the PC's decisions. Defendant also filed a motion to modify or terminate the PC's appointment. Defendant then filed a motion for attorney's fees and to apportion the PC's fees between the parties. At the hearing on his motions, "Defendant testified that approximately eight (8) parenting coordinator decisions made between January 14, 2021 and April 13, 2021 created unnecessary confusion and conflict between the parties. Additionally, the decisions concerning the 2021 summer schedule created an unequal distribution of days between the parties . . . ." The trial court, in denying Defendant's motions, found that the PC's decisions were "based on rational and reasonable consideration of the children's best interests" and "did not substantially alter the time-sharing arrangement set forth in the custody order," and that the parties would continue to benefit from the continuing services of a parenting coordinator.

The PC filed a report on 24 September 2021 detailing numerous problems with the permanent custody order and suggesting that Defendant receive a psychological evaluation. In response, Defendant moved the trial court to order Plaintiff to undergo a psychological evaluation, alleging that "Plaintiff exhibits many behaviors that are to the detriment of the minor children, and Defendant's ability to co-parent with her," and that "[a]n evaluation of Plaintiff would substantially assist the Court in its

determination of whether Plaintiff is a fit and proper person to parent the minor children."

After a hearing on 27 October 2021 on the PC's first report, Defendant engaged in the following litigation, characterized as "retaliatory" by the trial court: Defendant filed a bar grievance against the PC; Defendant undertook extensive discovery requiring the PC to spend more than 10 hours producing hundreds of pages of emails, including all her emails with the Defendant; Defendant noticed the PC to appear and testify at a deposition; and Defendant threatened to file a motion for sanctions against the PC. Also, immediately following that hearing, Defendant unilaterally informed the minor children of changes in the custodial schedule prior to any order having been submitted, causing distress to the children. The trial court found that Defendant "was aggressive and threatening toward the Parent Coordinator" and "ordered [Defendant] to stop using hostile language and threatening the PC."

The trial court's First Temporary Order, issued after a hearing on the PC's first report, made numerous findings regarding Defendant's hostile and disruptive behavior which negatively affected the children's physical and mental health, most of which were included in the Order on Appeal.

These intermediate orders, none of which are challenged on appeal, establish that Defendant's pattern of litigious, uncooperative, and hostile conduct, and Defendant's refusal to cooperate with the PC, adversely affected the children's health,

and that Defendant's involvement of the children in the litigation caused distress to the children.

Furthermore, the findings of fact supported the trial court's conclusions of law that since the entry of the last custody order there has been a substantial change in circumstances that adversely affects the minor children and a modification of the permanent custody order is warranted.

Defendant argues essentially that because this case has always been high conflict and because he has always been difficult, there has been no substantial change in circumstances. However, the findings of fact do not evidence a mere continuation of conflict and Defendant's poor behavior; the findings show an increase in both, starting after entry of the Permanent Custody Order and continuing to escalate until the entry of the First Temporary Order changing the terms of the custody. Moreover, even if this case presented merely a sustained high level of conflict caused by Defendant's continuous difficult behavior over a period of time, the effect of the conflict and behavior has led to a substantial change in the parenting coordinator's and Plaintiff's ability to deflect and absorb such conflict and ensure the health and well-being of the children. This substantial change has negatively affected the children.

## B. Best Interests

"Upon determining that a substantial change in circumstances affecting the welfare of the minor child occurred, a trial court must then determine whether

modification would serve to promote the child's best interests." *Shipman*, 357 N.C. at 481, 586 S.E.2d at 257 (citation omitted). Trial courts are "vested with broad discretion in custody cases and will not be overturned absent an abuse of discretion." *Hall v. Hall*, 188 N.C. App. 527, 530, 655 S.E.2d 901, 903 (2008) (citation omitted).

As detailed above, the trial court's findings of fact are supported by substantial record evidence. Moreover, the findings of fact amply support its conclusion of law that modification of the Permanent Custody Order would serve the children's best interests.

## C. Primary Decision Making

"[North Carolina] trial courts have wide latitude in distributing decision-making authority between the parties based on the specifics of a case." *Peters v. Pennington*, 210 N.C. App. 1, 17, 707 S.E.2d 724, 736 (2011) (citation omitted). The trial court's deviation from pure joint legal custody is reviewed on appeal for abuse of discretion, but "a trial court's findings of fact must support the court's exercise of this discretion." *Id.*

Here, the trial court ordered as follows:

> The parties shall continue to share joint legal custody. The parties shall in good faith confer and attempt to mutually agree on major decisions affecting the children's health, education and welfare. In the event the parties are unable to reach mutual agreement on a major decision, the Plaintiff shall have final decision-making authority. Day-to-day decisions shall be made by the custodial parent.

*COLLINS, J., dissenting.*

This decision was supported by sufficient findings of fact to show that such a decision was warranted, namely, Defendant's extensive history of misconduct and refusal to cooperate with Plaintiff and the PC. As discussed above, the trial court made findings of fact detailing past conflict between the parties which illustrate Defendant's hostility and refusal to cooperate and the effect Defendant's misconduct had on the minor children.

Defendant has failed to show that the trial court's decision giving final decision-making authority to Plaintiff on major issues involving the children was manifestly unsupported by reason or that it could not have been the result of a reasoned decision. Accordingly, I would hold that the trial court did not err.